BIG APPLE BMW, INC.; Potamkin BMW and VW, Inc.; Robert Potamkin; Alan Potamkin, Appellants in No. 91–1339,

v.

BMW OF NORTH AMERICA, INC.; and Bayerische Motoren Werks, A.G.

BIG APPLE BMW, INC.; Potamkin BMW & VW, Inc.; Robert Potamkin; Alan Potamkin

v.

BMW OF NORTH AMERICA, INC.; and Bayerische Motoren Werks, A.G.

BMW of North America, Inc., Appellant in No. 91–1458.

Nos. 91–1339, 91–1458.

United States Court of Appeals, Third Circuit.

Argued Nov. 18, 1991.

Decided Aug. 6, 1992.

Rehearing and Rehearing In Banc Denied Sept. 2, 1992.

Harold E. Kohn (argued), Robert J. La-
Rocca, Kohn, Savett, Klein & Graf, Charles
J. Bloom, Kleinbard, Bell & Brecker, Phila-
delphia, Pa., for appellants cross appellees.

Henry T. Reath, Lewis R. Olshin, Duane, Morris & Heckscher, Philadelphia, Pa., James W. Quinn (argued), Mindy J. Spector, Weil, Gotshal & Manges, New York City, for appellee cross appellant.

Before: MANSMANN, COWEN and ROTH, Circuit Judges.

## OPINION OF THE COURT [1]

MANSMANN, Circuit Judge.

In these cross appeals, we are once again called upon to delineate that quantum of evidence necessary for an antitrust plaintiff to prove in order to withstand a motion for summary judgment. Here the unsuccessful applicants for several BMW franchises brought suit against the United States distributor for BMW automobiles, BMW of North America (BMW NA). The applicants (the Potamkins) assert that BMW NA and its dealers violated the Sherman Act by engaging in concerted action to exclude them . from becoming dealers. BMW NA contends that it acted independently of its dealers and tenders business reasons for its refusal to deal with the Potamkins. In response, the Potamkins have countered each business reason with circumstantial evidence of concerted action. Thus faced with equal and competing inferences, we must apply to the standard for summary judgment, in which all inferences must be drawn in favor of the non-moving party, *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir.1991), the holding in *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984), that in an antitrust action "there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor."

The plaintiffs are brothers Robert and Alan Potamkin, and their corporate entities, Big Apple BMW, Inc. and Potamkin BMW and VW, Inc., who, in 1985, sought BMW franchises in Manhattan, New York

and Philadelphia, Pennsylvania. The Potamkin family, which for our purposes includes Robert, Alan, and their father Victor, owns approximately 45 automobile franchises located in Manhattan, Philadelphia, Atlanta, and Miami. According to Victor, these franchises collectively amassed a sales volume of between $800 and $900 million in 1987 alone. A657.

The Potamkins asserted in their complaint that BMW NA and certain of its dealers engaged in a "group boycott to exclude plaintiffs and pursuant to a contract, combination or conspiracy with certain BMW dealers to fix, raise, maintain and stabilize prices of BMW automobiles in the United States." Complt. at ¶ 34. Briefly, BMW NA contends that it unilaterally rejected the Potamkins because their high volume price-discounter image is incompatible with the image of BMW NA and because the Potamkins did not meet other required standards.

We conclude that, for purposes of summary judgment, the Potamkins have set forth sufficient evidence of concerted action between BMW NA and its dealership body to exclude the Potamkins and further produced evidence that tends to show that BMW NA's alleged reasons for rejecting the Potamkins were pretextual. Thus, we will vacate the judgment with respect to the antitrust claims and the closely related pendent state law antitrust and tortious interference claims and remand them for further proceedings. These counts will then be joined with the Pennsylvania Board of Vehicles Act claim, the sole claim that the district court had excepted from summary judgment, for further proceedings.

## I.

The factual underpinnings for the Potamkins' claims arose from three distinct, but allegedly related, incidents in which the Potamkins negotiated with BMW NA and BMW dealers for franchises in the Philadelphia and New York City metropolitan areas. The first incident involved Victor

---

**1.** References to portions of the record filed under seal have been deleted from the published version of this opinion. Deletions in this published opinion of the court are indicated by three asterisks, and the length of the matter deleted is given in brackets.

Potamkin's negotiations for a Great Neck, New York franchise in 1981. It admittedly falls outside the statute of limitations but is included for the purpose of demonstrating a pattern of conduct. The latter two incidents comprise the Potamkins' basis for liability. We provide only a cursory sketch of these incidents here because the evidence will be later reviewed in detail.

First, during 1981, Victor Potamkin met with BMW NA representatives on several occasions to discuss Victor's acquisition of a Great Neck, New York BMW franchise. The Potamkins allege that Victor and BMW NA's Eastern Regional Manager Terry Cronin reached an oral agreement for a BMW franchise; BMW NA insists that their discussions terminated prior to any agreement because Victor allegedly attempted to bribe Cronin. Both parties agree that these discussions ended without a written agreement. By letter dated November 4, 1981, BMW NA conveyed to Victor its desire not to appoint a dealer in Great Neck. A1203.

The second incident occurred in 1985. Gladys Caufield, owner of the Trans–Atlantic BMW dealership in Manhattan, in anticipation of losing her lease, began to negotiate with the Potamkins. A1613–14. In early September, they reached an oral agreement of sale for a price of $800,000 plus an undetermined amount for parts. In the ensuing months, however, BMW NA informed Caufield that it would not award a franchise to the Potamkins, and only days before the expiration of her lease, BMW NA offered her the significantly lower amount of $550,000, plus a repurchase of parts as required by the franchise agreement. A1640. She accepted this offer and BMW NA closed Trans–Atlantic, leaving only one dealer remaining in Manhattan. A1648–49.

The third incident occurred in Philadelphia, contemporaneously with the second, when Robert Potamkin entered into a written agreement to purchase the assets of Irvin Green's BMW dealership in October of 1985. A1720–47. This "buy-sell" agreement was contingent upon Robert's acquisition of a BMW franchise, and included an expiration date of December 23, 1985. A1729–30. Robert sought immediately to obtain a franchise application from BMW NA, and although they vigorously contest the reasons, both parties agree that Robert's application was not taken until October 29, 1985. Thus, as BMW NA recognized, it had 60 days from October 29th in which to act on the application under state law. After the buy-sell agreement expired on December 23rd, BMW NA informed Green that Potamkin was not a suitable candidate for a BMW franchise. A869–70.

The Potamkins filed suit in April of 1987, alleging that BMW NA violated section 1 of the Sherman Act, 15 U.S.C. § 1, sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (Count I), and the Pennsylvania Board of Vehicles Act, 63 Pa.Stat.Ann. § 818.1, *et seq.* (Purdon's Supp.1991) (Count II). In addition, the Potamkins alleged that BMW NA tortiously interfered with their contractual and prospective business advantage (Count III), committed state law civil conspiracy (Count IV), and utilized unfair methods of competition under Pennsylvania law and New York's Donnelly Act (Count V).

After lengthy and acrimonious discovery, in May of 1989, BMW NA moved for summary judgment. Much of the evidence provided in support of its motion involved information that the district court had ruled inadmissible in its April 18, 1989 order limiting discovery. A59–60. In answer to the Potamkins' responsive motion, as well as to amplify its previous order, the district court issued an order on June 2, 1989, which excluded, for purposes of summary judgment, "information concerning plaintiffs' specific customer satisfaction rankings except to the extent that such information was known to and allegedly relied upon by the defendant in 1985, and has been disclosed to plaintiffs in discovery...." [2] A1448–49.

---

**2.** In its appellate briefs, BMW NA has continued to cite to that evidence ruled inadmissible by the district court but has failed to challenge those rulings. We will, therefore, review the evidence as confined by those orders.

In due course, the district court ruled in favor of BMW NA on each count, except for Count II, the Pennsylvania Board of Vehicles Act claim, which it reserved for trial. The Potamkins sought and received a Rule 54(b) certification from the district court as to those counts on which summary judgment was entered. On the state law claim of Count II, the district court certified a controlling question of law concerning standing to sue under the Board of Vehicles Act, and we subsequently granted BMW NA permission to appeal the denial of summary judgment on that claim pursuant to 28 U.S.C. § 1292(b). This appeal and cross-appeal followed.

The district court exercised federal subject matter jurisdiction over the Sherman Act claim and pendent jurisdiction over the state law claims. Our standard of review is plenary. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We review the dismissal of the pendent state claims utilizing an abuse of discretion standard. *Cooley v. Pennsylvania Housing Finance Agency*, 830 F.2d 469 (3d Cir.1987).

## II.

### A.

As the district court accurately stated in its unpublished Memorandum Opinion, 1990 WL 182340 "[t]he narrow issue upon which decision turns is whether plaintiffs have enough evidence to get to a jury on the issue of concerted action." *Id.* at 5. The district court first concluded that the Potamkins had failed to produce direct evidence that BMW dealers opposed the Potamkins as dealers, complained to BMW NA about the Potamkins, or that BMW NA's decisions were responsive to dealer complaints. *Id.* at 6. The district court then evaluated "19 bits of evidence which, [the Potamkins] argue, support … an inference [of the requisite concerted action]."[3] *Id.* After considering each of the "19 bits" individually, the district court concluded that it was "left with the reason-

ably firm conviction that, while the evidence does not rule out the possibility that the defendant's rejections of plaintiffs' applications were the product of concerted action between defendant and one or more of its dealers, there is simply no proof of concerted action sufficient to withstand a motion for summary judgment." *Id.* at 15.

### B.

■ Summary judgment should be granted where no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). It is no longer a disfavored procedural shortcut, and may present the district court with the first opportunity to dispose of meritless cases under the federal practice of notice pleading. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2354, 91 L.Ed.2d 265 (1986). This is true even in antitrust cases, "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot," *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469 (3d Cir.1985).

The summary judgment standard has been likened to the "reasonable jury" directed verdict standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The moving party need not produce evidence to disprove the opponent's claim, *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552, but does carry the burden to demonstrate the absence of any genuine issues of material fact. If the movant has produced evidence in support of summary judgment, then the

---

3. These "19 bits" of evidence are listed *infra* at footnote 11.

opponent may not rest on the allegations set forth in its pleadings but must counter with evidence that demonstrates a genuine issue of fact. Fed.R.Civ.P. 56(e). This, in turn, requires the opponent to "set forth specific facts showing that there is a genuine issue for trial." *Id.*

■ When deciding a motion for summary judgment, nonetheless, a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations. *Country Floors*, 930 F.2d at 1061. Thus an opponent may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15. Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. *Country Floors*, 930 F.2d at 1061 (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d at 573).

This trial "on paper" differs from a trial before a jury in one significant detail: "at the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. This does not require a court to turn a blind eye to the weight of the evidence; the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. To raise a genuine issue of material fact, however, the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

A non-movant's burden in defending against summary judgment in an antitrust case is no different than in any other case. As was recently clarified by the Supreme Court:

> The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. If the plaintiffs theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

*Eastman Kodak Co. v. Image Technical Services*, —— U.S. ——, ——, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) (footnote omitted).

Therefore, in the summary judgment context, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the opposing party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 587. These inferences, however, when drawn from ambiguous evidence, are circumscribed in antitrust cases because a fine line demarcates concerted action that violates antitrust law from legitimate business practices. *See Monsanto*, 465 U.S. at 762–64, 104 S.Ct. at 1470–71. Care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not infringe upon the defendant's freedom, so long as it acts independently, to refuse to deal, *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), or to impose vertical non-price restraints, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Nevertheless, the summary judgment movant must show that an inference of concerted action to exclude competition from evidence of BMW

NA's inconsistent behavior and dealer complaints is unreasonable. *See Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2083.

### C.

■ Of course, in ruling upon a motion for summary judgment, a court must evaluate the material facts against the substantive proof required of the plaintiff. For a section 1 claim under the Sherman Act, a plaintiff must prove "concerted action," a collective reference to the " 'contract ... combination or conspiracy.' " *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 445–45 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *see Edward J. Sweeney,* 637 F.2d at 111. If, as BMW NA asserts, it acted independently in denying the Potamkins a franchise, no antitrust liability would attach. *Colgate,* 250 U.S. at 307, 39 S.Ct. 468. Moreover, the inferences of concerted action that may be drawn from circumstantial evidence in antitrust cases is circumscribed. Thus an antitrust plaintiff must be prepared to demonstrate a causal relationship between alleged dealer complaints *and* a distributor's action in order to show that the concerted action in violation of the Sherman Act is distinguishable from "perfectly legitimate" independent conduct. *See Monsanto,* 465 U.S. at 763–64, 104 S.Ct. at 1470–71.

In that regard, proof of causation requires more than a sequence of dealer complaints to a distributor that are followed by the distributor's conduct alleged to violate antitrust laws. *Edward J. Sweeney,* 637 F.2d at 111–15. A jury may not be permitted to speculate as to cause from a chain of events, *id.* at 111; the plaintiff must demonstrate adequately " 'a unity of purpose or a common design and understanding, or a meeting of the minds.' " *Id.* (*quoting American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)).

As the Supreme Court admonished in *Monsanto,* we ought not to permit an inference of an agreement in violation of the Sherman Act to arise merely from "the fact that termination came about 'in response to' complaints." 465 U.S. at 763, 104 S.Ct. at 1470. Permitting such an inference could "deter or penalize perfectly legitimate conduct"; non-price restrictions may simply reflect normal business conditions which do not raise the specter of concerted action. Moreover, dealers are often important sources of information for distributors or manufacturers and these sources should not be restricted by impractical antitrust prohibitions. *See id.* at 763–64, 104 S.Ct. at 1470–71.

In *Monsanto,* the Court ruled that *more* than mere complaints of concerted action were necessary to defeat the motion for summary judgment. Accordingly, "[t]here must be evidence that tends to exclude the possibility that the manufacturer and non-terminated distributors were acting independently." 465 U.S. at 764, 104 S.Ct. at 1471. "[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.* (citing *Edward J. Sweeney,* 637 F.2d at 111).

*Monsanto* does not require that a plaintiff provide *direct* evidence of a causal relationship; concerted action may be inferred from circumstantial evidence. *See id.,* 465 U.S. at 764, 768, 104 S.Ct. at 1470, 1472. That evidence should be analyzed as a whole, rather than compartmentalized, to determine whether it supports an inference of concerted action. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In *Continental Ore,* the Court admonished federal courts not to "approach [antitrust] claims as if they were ... completely separate and unrelated lawsuits." *Id.* at 698, 82 S.Ct. at 1410.

In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.... [T]he duty of the jury was to look at the

whole picture and not merely at the individual figures in it.

370 U.S. at 699, 82 S.Ct. at 1410.

We utilized this approach in *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564 (3d Cir.1986), in which the plaintiff asserted that GM and its dealers conspired to deny the plaintiff a franchise in violation of section 1 of the Sherman Act. There we found sufficient to withstand summary judgment the evidence that GM had favorably viewed Arnold Pontiac's franchise application until after the GM dealers' collectively expressed disapproval and threatened non-cooperation. *Id.* at 573–74. Arnold Pontiac had met the *Monsanto* standard, specifically that the conduct of the dealers constituted sufficient evidence that "tends to exclude the possibility that [GMC acted] independently." *Id.* at 574 (quoting *Monsanto*). We concluded that a reasonable inference of concerted action could be drawn from the whole of the evidence and remanded the case for trial. *Id.*

■ Here, the Potamkins assert, and we agree, that the district court inappropriately compartmentalized their evidence and drew inferences in favor of BMW NA rather than in their favor. They argue that the district court's holding, in effect, would require that to successfully defend against summary judgment, they must produce evidence sufficient to prevail upon their own motion for summary judgment. In essence, the Potamkins urge, and we agree, that in defending against summary judgment, they need not "eliminate all possible 'independent' justifications by the manufacturer, [so that] *only* evidence of concerted action would be left in the record." They need, rather, to produce "evidence that tends to exclude the possibility of independent action." *Monsanto*, 465 U.S. at 768, 104 S.Ct. at 1473.

According to the Potamkins, *Monsanto* cannot be read to require an opponent of summary judgment to produce the same quantum and kind of evidence it would need to affirmatively make its own motion for summary judgment. Thus, the Potamkins urge that a reading of *Monsanto* that

requires them to affirmatively disprove any legitimate reasons for BMW NA's actions would be inconsistent with the burden of proof required for a non-movant to defeat a summary judgment motion. In this case, that consideration is especially germane because the quantity of the Potamkins' evidence is outweighed by the quantity of BMW NA's evidence. BMW NA primarily contends that summary judgment is appropriate because "there [is] no evidence to establish that BMW dealers were opposed to appellants' efforts to obtain franchises, or that any BMW dealers complained to BMW NA about [the Potamkins], or that BMW NA's refusal to appoint [the Potamkins] as dealers was in response to dealer complaints." With the foregoing orientation, we now turn to review the evidence presented in this case.

### III.

The Potamkins have produced evidence of concerted action spanning several years and three locations. For the sake of clarity, we will order the evidence according to the location in which the Potamkins sought a particular franchise. There is consistent evidence that BMW NA encouraged the Potamkins to acquire BMW dealerships, that the New York and Philadelphia dealers subsequently complained to BMW NA about the Potamkins, and that BMW NA later denied the Potamkins franchises giving allegedly pretextual reasons.

### A.

*1981: Great Neck*

In 1980, Victor Potamkin initiated negotiations with BMW NA for a franchise by writing to BMW's German manufacturer. A1463. In response, Terry Cronin, BMW NA's Eastern Regional Manager, sent the following correspondence to Victor in November of 1980:

Obviously, because I reside and work in the New York Metro area, I am personally well aware of your status as a proven and successful automobile executive. Dealerization for the northeast portion of the United States comes under the re-

sponsibility of the Eastern region. I would be very happy to meet with you at your convenience to discuss whatever mutual opportunities may exist between yourself and BMWNA.

A1464.

Accordingly, Victor and Cronin met on approximately four or five occasions. Cronin testified in his deposition that following initial meetings, also attended by Andrew Pokorny, BMW NA's Vice President of Sales, A1487–88, 1507–09, he "was favorably impressed with Victor" as an individual, although Cronin shied away from opining as to Victor's suitability for a dealership at that time. A1491–92. These meetings focused upon available "open points." [4] As one basis for its termination of negotiations, BMW NA contends that Victor's interests lay not in the Great Neck open point that BMW NA sought to fill, but in Atlanta and Miami, A1489–90, or North Plainfield, New Jersey. A1501. Cronin testified, but Victor denies, that Victor was primarily interested in a North Plainfield, New Jersey, franchise rather than one in Great Neck, New York. A261; A645.

However, despite inquiries about other locations, BMW NA does not dispute, and Cronin testified, that Victor located a facility in Great Neck. A1495–96. Cronin, who visited that facility, A1496–97, testified that "It probably needed a great deal of renovation. But I believe it could have been suitable for BMW." A1498. Cronin also testified that the Potamkins envisioned this as an exclusively BMW franchise and may have anticipated selling as many as 500 cars annually. A1500.

Negotiations proceeded apace as Cronin subsequently met with Robert and Alan Potamkin at BMW NA's eastern regional office, to review a "pro forma facility investment analysis" during the summer of 1981. A1499, 1508. At the conclusion of this meeting, Cronin was still interested in the Potamkins' pursuit of the Great Neck point, A1503, and Robert and Alan were expected to report back to Victor and con-

tact BMW NA if they were still interested. It remains Victor's belief that during these negotiations he and BMW NA reached an oral agreement on the Great Neck BMW franchise. A645.

Later, during that fall, Cronin again met with Victor at the "21 Club" in Manhattan, where, Cronin testified, they discussed the viability of BMW in Great Neck over lunch and Victor again allegedly inquired about North Plainfield. A1509. Afterward, in Victor's limousine, BMW NA alleges that Victor attempted to bribe Cronin for a North Plainfield location. Cronin testified: "... [H]e said to me that North Plainfield was very important to him; that it would be worth a lot of money to him, $25,000, if he were awarded the North Plainfield point." A1510. Cronin immediately returned to his office and telephoned Gordon Bingham, then-Vice President of Operations and Jack Cook, then-President of BMW NA, to report the alleged bribe. A1513–14; A1522–23. Pursuant to Cook's instructions, Cronin did not tell anyone else of this incident, nor did he document it. A1523–1526. It is not disputed that others at BMW NA became aware of the alleged bribe.

By letter dated November 4, 1981, from Cronin, Victor learned:

> After much deliberation, we have decided that the appointment of a BMW dealer in Great Neck, at this time, would not be the proper long range solution to our long standing problem. In lieu of an appointment, we have opted to work with our existing dealer body to improve the overall representation of BMW on the Northshore of Long Island.

A1203.

In support of their allegation of concerted action, the Potamkins have produced the affidavit of Harry Gray. In 1981, Gray served as a Long Island BMW dealer and a member of the area Dealer Advertising Group ("DAG"). Dealer Advertising Groups are composed of regional dealers who meet regularly with BMW NA representatives to coordinate advertising strate-

---

**4.** An "open point" is a location for which a new franchise is slated in contrast with a "buy-sell" situation in which a new dealer replaces a retiring one.

gy. A1854–55; * * * [one sentence deleted]. In his affidavit, Gray reported dealer opposition to a Potamkin franchise featured at a DAG meeting:

2. Great Neck, Long Island, was a BMW "open point" during the early 1980's. I knew that BMW had expressed interest in having Victor Potamkin as a franchised dealer at that location.

3. At that time, I recall attending a BMW Dealer Advertising Group ("DAG") meeting with other BMW dealers from the New York area and with BMW employees. I recall specifically that the dealer principals for BMW dealerships in Brooklyn, New York, Jamaica, New York, Smithtown, New York and Inwood, New York were present. There were other BMW dealers present as well.

4. There was a discussion among the BMW dealers about the possibility of Victor Potamkin obtaining the Great Neck, BMW open point.

5. The dealers opposed BMW granting Victor Potamkin a BMW franchise. The dealers feared that Mr. Potamkin would take away significant business from them, and would "alter the competitive landscape", as I believe one dealer expressed it.

6. The dealers understood and expressed that Mr. Potamkin's Great Neck dealership had already been approved at the level of BMW's central office, in Montvale, New Jersey. However, *the central office had decided to leave the final decision to the regional office for the BMW Eastern region,* which region included all of the New York-area dealerships.

7. *BMW dealers at the meeting said they had already spoken to Terry Cronin, the BMW Regional Manager for the Eastern region,* opposing Mr. Potamkin's BMW franchise appointment, *and that they would continue to speak to him on this subject,* since the dealers understood that Mr. Cronin had significant input on this matter.

8. I subsequently came to understand that Terry Cronin had opposed this appointment, which I concluded was in response to the New York-area BMW dealers' objections.

A1541–43 (emphasis added).

Assuming that Gray's trial testimony would be consistent with his affidavit, the district court ruled it inadmissible, reasoning that Gray's testimony would not establish a conspiracy between BMW NA and the New York area dealers. Specifically, the district court found that Gray's affidavit did not establish that dealer opposition had been communicated to BMW NA nor that BMW had acted in response to dealer complaints. Memorandum Opinion at 8. Therefore, the district court ruled that Gray's conclusion of causation constituted "[t]hat kind of unfounded speculation [that] would not be admissible at trial, and does not prove anything." *Id.*

The Potamkins argue that the affidavit itself evidences communication of dealer opposition to BMW NA because Gray states first, that Cronin possessed authority to approve Victor for the Great Neck point; second, that some of the DAG members had communicated their opposition to Cronin; and third, at the meeting they expressed an intent to continue to communicate to Cronin their opposition.

The record also supports this first proposition; prior to Michael Jackling's installation as BMW NA's Vice President, Director of Operations in October of 1985, BMW dealership appointments were largely relegated to the regional offices. A2378. While there is little in the record to flesh out the details of the pre-Jackling era dealer appointment procedure, a jury could reasonably infer, from the evidence that Jackling confined post–1985 decisions to BMW NA's Montvale headquarters, that regional representatives wielded a significant amount of power over appointments prior to 1985.

* * * [one sentence deleted].[5] Thus the third proposition, according to the Potamkins, would be supported by Gray's testimony of concerted action on behalf of the New York area dealership body with BMW

---

5. * * * [one sentence deleted].

NA to reject Victor's appointment as a price competitor. BMW NA accurately notes that, as factual matters, the Gray affidavit does not even identify Cronin as one of the unnamed BMW NA employees present at that DAG meeting. Nor does it contain evidence that BMW NA considered the alleged dealers' demands. This factual argument, however, properly belongs in front of a jury. That Gray's affidavit is not a proverbial smoking gun does not make it inadmissible.

As a legal matter, BMW NA suggests that the Gray affidavit is inadmissible because it allegedly contains only Gray's surmise of causation and lacks the requisite personal knowledge required by Fed. R.Civ.P. 56(e). In this respect, BMW NA cites *Edward J. Sweeney, Inc.*, in which we held, in part, that the plaintiff had failed to meet its burden to prove concerted action, when defending against summary judgment. 637 F.2d at 116–17. Significantly, in that case we did not rule that evidence of concerted action inadmissible, but simply insufficient to sustain the plaintiff's burden of proof. This case, as distinguished from *Edward J. Sweeney*, presents more evidence than a witness's "general feeling," 637 F.2d at 114, and another witness's " 'belief' ... without factual basis," 637 F.2d at 112. *See also Mid–South Grizzlies v. National Football League*, 550 F.Supp. 558 (E.D.Pa.1982) (finding a statement that some people opined that the applicant's past WFL affiliation would hurt its chances of obtaining an NFL affiliation was insufficient to prove retaliation, in part because the witness admitted these views were personal to the speakers and did not represent the NFL's position), *aff'd*, 720 F.2d 772 (3d Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984).

In addition, we noted in *Edward J. Sweeney* that "absent some evidence supporting appellant's theory, we will not assume [that the defense witness] lied about his [legitimate] reasons." 637 F.2d at 113. By contrast, Gray's affidavit, combined with the

segment of a 1978 BMW "Policy and Procedure Manual for Dealer Development," indicates that Cronin was given decision-making authority and that area dealers had voiced to Cronin, and intended to continue to voice, their opposition to a Potamkin franchise. The fact that Cronin has categorically refuted any dealership pressure or discussions with dealers concerning Victor's interest in a BMW franchise does not serve to render Gray's affidavit inadmissible, but simply creates a material fact for the jury to resolve. *See* A265.

The Potamkins do not request that we simply discredit the testimony of BMW NA's witnesses in order to deny summary judgment. Rather, they have proffered significant, albeit circumstantial, evidence to counter this evidence. For example, Robert alleges that one New Jersey BMW dealer, Gene Hoffman, revealed to him in late 1985 that "BMWNA's decision in 1981–82 not to give the Potamkins a BMW franchise in Great Neck, Long Island was due to the fact that other Long Island BMW dealers feared the price competition that a Potamkin BMW franchise would bring to the Long Island market." A1712. Hoffman has testified inconsistently that 1) he cannot recall the substantive content of his conversations with Robert and 2) he denies Robert's allegations. A417–18. Reasonable inferences of concerted action may be drawn from the Gray affidavit combined with Hoffman's comments, BMW NA's alleged abrupt reversal of opinion, and, as will be seen below, Cronin's solicitation of Robert even after the alleged bribe attempt.

Unlike the plaintiff in *Edward J. Sweeney*, who failed to disprove the defendant's legitimate reasons, the Potamkins have produced evidence that tends to negate BMW NA's allegation of the attempted bribe. BMW NA has not explained why, if the bribe incident occurred, later in 1982 Cronin suggested to Robert Potamkin that he purchase Irv Green's franchise as Robert alleges. A1704.[6] The absence of any

---

6. BMW NA's response at appellate oral argument to the apparent inconsistency between Cronin's outrage in 1981 at the alleged bribe

and his solicitation of Robert's application in 1982 is two-fold: (1) Robert's recollection of the 1982 date is inaccurate, or (2) Cronin had no

BMW NA documentation of the bribe and Cronin's November 1981 letter to Victor evidencing different concerns further serves to buttress an inference that this alleged bribe may have been conjured up later. The Potamkins point out that Victor and Gunter Kramer, BMW NA's President, had a cordial lunch together in 1983, A1460; 2171, although Kramer responds that, new to his position at that time, he had not yet been informed of the bribe. A484–86.

Given this sequence of events, a reasonable jury could infer that BMW NA would have welcomed a "high volume" dealer such as Victor, and after succumbing to pressure from its New York area dealers, entertained the prospect of installing a Potamkin dealership in an alternative location, Philadelphia.

## B.

### 1985: Manhattan

In early September of 1985, the Potamkins[7] began negotiating with Gladys Caufield and her lawyer, Marvin Buchner, in order to purchase Caufield's Manhattan BMW dealership, Trans–Atlantic. Caufield explained that she had sought to sell her business to the Potamkins because "... it just made more sense ... you know, they had the wherewithal to really do a beautiful job and I thought that's what BMW was looking for." A1662–63. Because her lease was expiring, she was compelled to sell the business by the end of December of 1985. A1612–1614. At a September 9th meeting, the Potamkins offered to buy Trans–Atlantic for $800,000 plus an undetermined amount for parts. A1620. On September 30th, Cronin spoke to Buchner, and urged that Caufield stall the Potamkin deal so that BMW NA could make an offer by October 10th. A1673.

Having heard nothing from BMW NA, Buchner unsuccessfully attempted to reach Cronin on October 16th. A1674. Subsequently, the Potamkins and Caufield reached an "agreement in principle" on October 29, 1985, subject to successfully negotiating a written sales agreement. A1632, A1674. BMW NA again stepped into the picture the next day, on October 30th, when Cronin and Andy Pokorny of BMW NA met with Buchner, Caufield and her partner at Trans–Atlantic. A1633. Buchner testified that Cronin advised them "that BMW would not accept Potamkin as a dealer" and "BMW wanted Manhattan to be a one-dealer territory" and they should "delay signing an agreement with Potamkin until BMW could make its offer to Trans–Atlantic." A1633. Buchner believed that BMW's opposition to the Potamkins was related to discounting and reputation for service. A1634.

Informing them of the agreement in principle, A1634–35, Buchner countered that if a signed agreement was submitted to BMW for approval and was rejected, it would precipitate litigation by Trans–Atlantic and probably Potamkin against BMW. A1633. The following day, October 31st, BMW NA's counsel, Michael Epstein from Weil, Gotshal & Manges, contacted Buchner and asked to see the agreement with the Potamkins; Buchner refused and the two agreed to a November 5th deadline for a BMW NA offer. A1635–36. On November 7th, Caufield, her partner, and Buchner met with BMW NA's Vice President Michael Jackling and Michael Epstein and Arthur Jacobs of Weil, Gotshal & Manges. A1639.

After reviewing the Potamkin negotiations, BMW NA offered Caufield $500,000 plus repurchasing assets as required under the franchise agreement. A1640. No

---

responsibility for the Philadelphia territory. The first explanation clearly raises an issue of credibility for the jury. The second explanation is not borne out by the record. Prior to 1985, when the Mid–Atlantic Region was first formed, Cronin served the Eastern Region which encompassed Philadelphia. *See* A1853. Moreover, Green's testimony shows that Cronin supervised his dealership. *See* A1769.

**7.** Gladys Caufield testified that she believed that she and her lawyer, Marvin Buchner, negotiated with all three of the Potamkins, A1663, because she met with all three at one time. Moreover, Buchner initially contacted one of Victor's salesmen to inquire into the Potamkins' interest in Trans–Atlantic. A1621.

agreement was reached, but Jackling did indicate that BMW NA would not award a franchise to the Potamkins because, as Buchner recalled, it was "the tenor of his comment that they were price discounters." A1641. In response to a counteroffer based on the price the Potamkins were willing to pay, BMW NA's counsel "indicated to [Buchner] that the position of BMW was that these premises were closing down and that we really had nothing to sell, they had nothing to buy." A1642.

Buchner then called the Potamkins' lawyer and explained that Caufield would not sign that agreement until the Potamkins could provide a possession date. A1643. Nothing happened until December 17th, when Jacobs offered Buchner BMW NA's top offer of $550,000,[8] and Caufield, pressed by an expiring lease, accepted. A1644. Buchner explained that "BMW, through Mr. Cronin, had made it crystal clear that they would not approve the Potamkin people; therefore, our choices of purchasers was limited to one and my instructions were to strike the best deal I could with BMW and close it." A1645. Caufield stated, "I think they indicated clearly that if we went ahead with the sale to Potamkin that we would be in litigation for a long period of time." "... [A]nd if we were in some kind of litigation I had parts and cars and whatever that would be tied up and it was sort of forcing the hand, so to speak." A1665.

BMW NA counters that it had long planned to eliminate one of its two Manhattan dealerships because New York is widely considered to be a one-dealer market, according to Cronin, and BMW NA already had an additional New York City dealership, Martin BMW. A296–97. Caufield testified that in 1984, BMW NA had once mentioned the possibility of buying Trans–Atlantic and turning it into a factory store or mausoleum, although no terms or prices were reached. A1655–56; 303–07. This was consistent with BMW NA's earlier plan for its Manhattan dealers, dubbed the "Manhattan Project," which envisioned eliminating the two Manhattan BMW dealerships by buying them out and then opening a factory store or mausoleum. A873–75; 298. For this reason, BMW NA suggests that Caufield's negotiations with the Potamkins were merely an attempt to obtain a valuation of her business. A305; A1335–38.

Following BMW NA's purchase of Trans–Atlantic's assets, however, it deviated from the "Manhattan Project", granting to Martin BMW an exclusive Manhattan franchise. BMW NA alleges it chose this course because it came to see the wisdom of not engaging in competition with its dealers.

Nevertheless, Robert asserts that one BMW dealer, Hoffman, later informed him that a BMW NA representative had "visited him and asked his opinion" about the proposed sale of Trans–Atlantic to the Potamkins. A1712. During BMW NA's negotiations with the principal of Martin BMW—prior to the Caufield/Potamkin negotiations—a Cronin memorandum anticipated the need to discuss with the area dealers the operation of a factory store. A2227; A873–75. The Potamkins theorize that the dealer opposition of 1981 was reactivated in 1985 to defeat their agreement in principle with Caufield for Trans–Atlantic and to award Martin BMW an exclusive Manhattan dealership.

### C.

*1985: Philadelphia*

Also during the fall of 1985, Robert and Alan Potamkin reached a written buy-sell agreement with Philadelphia BMW dealer Irvin Green, but once again fell short of acquiring a BMW franchise. Because this third attempt constitutes the heart of the Potamkins' lawsuit and BMW NA presents a multitude of reasons for its decision to reject Robert's franchise application, an especially detailed review is required.

Robert alleges that Cronin approached him in 1982 about acquiring the Philadelphia franchise owned by Irvin Green. Green conceded that BMW NA, particularly Cronin, had long been dissatisfied with

---

**8.** BMW NA ultimately paid $693,569 for Trans- Atlantic, inclusive of parts. A1649.

his meager sales performance * * * [phrase deleted]. Therefore, on October 8, 1985, Green and Robert entered into a buy-sell agreement for Green's BMW and Volkswagen franchises. A929–47. Robert, as half owner, would manage the dealership; Alan and another investor were each to contribute 25% of the capital. The Potamkins planned to move these franchises to a different location in Northeast Philadelphia, at the corner of Grant Avenue and Academy Road, which also housed Robert's Chevrolet, Dodge, Isuzu, and AMC Jeep Renault franchises. A595; A2065.

The buy-sell agreement was expressly contingent upon the award of BMW and Volkswagen franchises, and contained an expiration date of December 23, 1985. A1729–30. This expiration date, combined with BMW NA's alleged delay in delivering a franchise application to Robert, forms a significant part of the Potamkins' grievance with BMW NA. Although Green and Robert each sought to obtain a BMW franchise application immediately after signing their agreement, the Potamkins assert that BMW NA delayed sending the necessary application form until October 29, 1985. BMW NA was required to act on Robert's application under the Pennsylvania Board of Vehicles Act, 63 Pa.Stat.Ann. § 818.-9(b)(4), within 60 days. By delaying until October 29th, BMW NA ensured that this deadline would exceed the December 23rd expiration of the buy-sell agreement.[9] By letter to Irv Green dated November 25, 1985, Michael Jackling, at that time BMW NA's Senior Vice President of Operations, explicitly acknowledged this deadline.[10] A1746.

9. There is significant dispute concerning whether BMW NA made a good faith attempt to consider Robert's application. According to Robert's affidavit, by October 10th Green hand-delivered the buy-sell agreement to Philip Capossela, then the BMW Regional Manager for the mid-Atlantic Region, and requested a dealership application form which Capossela refused to provide. A1706. Capossela testified that he was thus aware of the expiration date, A103, and that at that time he told Green that Robert was not a "suitable" candidate for a franchise, in the words of BMW NA in-house counsel. A105–106. Robert telephoned Capossela and offered personally to travel to his Virginia office to obtain an application, but was told that the district manager would provide Robert with a copy and that he, Capossela, would contact Robert by October 16th. A1706–07. Robert was unable to reach Capossela again, but sent a letter, dated October 18th, A1716, and contacted Robert Casella, BMW Director of Dealer Development for the mid-Atlantic Region, on October 22, 1985, who again discouraged Robert from traveling to Virginia to obtain an application form. A1707. Casella agreed to meet with Robert on October 29th and to supply a form at that time. Robert then wrote a follow-up letter, A1717; Casella refutes Robert's recordation that Casella gave him assurances that there would be sufficient time to process the application before the expiration of the buy-sell agreement. A147; see also A1205–06 (Casella's "Inter-branch Memo" of the incident).

BMW NA provides a host of reasons for failing to decide on the application until after the agreement expired. It hints that * * * [clause deleted], and that field personnel could not have taken the application before October 29th and 30th. BMW NA also suggests that Irv Green did not properly tender notice of the alleged buy-sell agreement. Thus, Capossela testified that Green needed to enclose a cover letter to introduce the buy-sell agreement, and his personal delivery of the buy-sell agreement to BMW NA was insufficient notice. A1756.

Indeed Jackling asserted that Robert's application was incomplete, and the buy-sell agreement expired of its own accord. A2415–16. The record does not indicate why, if the application package was incomplete, Jackling directed counsel at Weil, Gotshal to hire a private investigator to investigate Robert pursuant to the application, nor why other processing steps were taken. * * * [one sentence deleted]. And Casella explained that an application is pending from the "time the [acquisition agreement] hits my desk." A1814.

Although District Parts Manager Graynor indicated that Robert and his proposed parts manager had refused to sign the Prospective Dealer Parts Department form, A2017, Robert contends they were never shown that form. A1974. Another BMW dealer, Martin Sussman, had refused to sign a BMW Dealer Operating Requirement Agreement because he disagreed with one of its conditions, but had not been threatened with termination of his franchise. A2141–44.

10. In relevant part, Jackling wrote:

I am informed that Pennsylvania law allows BMWNA to respond to a request for consent to the sale of a franchise "within 60 days of receipt of a *written request* on the forms, if any, generally utilized by the manufacturer or distributor for such purposes and containing the information required."

At your October 10, 1985 meeting with Mr. Capossela, BMWNA was not provided with a written request or with the information we require in order to evaluate your potential

As a result of this posturing, Andrew Pokorny, BMW NA's Vice President of Regional Operations and Sales, A289, sent to Irv Green a letter dated December 26, 1985, informing him that it would not award Robert Potamkin a franchise. By this time, the executory contract had already expired. Ultimately, Green sold his BMW franchise to an existing area BMW dealer, Robert Sloane, and his partner, Martin Lustgarten, who relocated the franchise to an affluent Philadelphia suburb.

The Potamkins allege that they were denied the Green franchise because Philadelphia area BMW dealers feared price competition and coalesced to pressure BMW NA into rejecting their application. As proof, they tender the testimony of Bruce Braverman, Robert's Lease Manager. This evidence consists of statements allegedly made by a BMW leasing representative, Don Mitchell, to Braverman. Braverman testified in his deposition that:

> Don Mitchell told me that the BMW dealers in the area would not let Potamkin get the franchise because they were afraid that Potamkin's reputation of selling cars cheaper than everybody else was not something that they wanted to get involved with. They didn't want to be involved in price competition. They wanted to keep their price levels where they were and that [sic] they were going to do what they could to make sure that Potamkin did not get the franchise.

A2195–96. In answer to the question "Did Mitchell indicate that he had spoken to anyone from BMW of North America?," Braverman also stated:

> No. He indicated to me that he had spoken to dealers. The dealers, it was the dealers who did not want Potamkin to get the franchise, it wasn't BMW who had rejected them.
>
> To me it seemed like it was a conspiracy of the dealers in the tri-state area that

didn't want Potamkin to get that franchise. I don't think BMW cared.

A2312. However, Braverman also answered negatively when asked, "Did Mr. Mitchell indicate that the dealers had specifically spoken to a particular individual at BMW?" A2312. Braverman memorialized this alleged conversation in a memorandum dated January 15, 1986. A2197. While this testimony also falls short of direct "smoking gun" evidence of causation, if admissible, it does supply additional circumstantial evidence of concerted action.

In excluding this evidence, the district court reasoned that Mitchell's statement would constitute hearsay unless he possessed authority to bind BMW NA, which he indisputably lacked. This conclusion misperceives the nature of a vicarious admission, which the Federal Rules of Evidence designate as outside the realm of hearsay by definition. Further, the vicarious admission rule of Federal Rule of Evidence 801(d)(2)(D) does not require that a declarant have authority to bind its employer. As the Advisory Committee noted when amending this rule, to limit its scope in this manner would preclude much probative evidence because an employer will rarely authorize its employee to make incriminating statements. Advisory Committee Note to Fed.R.Evid. 801(d)(2)(D). The rule simply requires that an agent make the statement "within the scope of" his or her employment.

To analyze the relevant scope of Mitchell's employment, we must first identify his employer. Braverman testified that Mitchell was BMW Credit's representative to Robert's prospective dealership. A2194–95. Yet according to BMW NA, Don Mitchell was employed by General Electric Capital Auto Lease (GECAL) as an area sales manager. A2426. Mitchell testified that he received his salary from GECAL without commissions from BMW Credit. A506.

purchaser. Mr. Potamkin submitted his application package on October 29. The following day, October 30, we received your written request for consent.
By statute, BMWNA's 60 days to evaluate the proposed sale of a franchise cannot expire on

a Saturday or Sunday. Consequently, whether we count from October 29 or from October 30, BMWNA's deadline is Monday, December 30, 1985.

The relationship between Mitchell's employer, GECAL and BMW NA is complex. * * * [three sentences deleted].

* * * [paragraph deleted].

■ As far as the record discloses, Mitchell was the only representative of BMW Credit and BMW Leasing assigned to serve the territory in which Robert's proposed dealership was located. Mitchell described his job function as "solicit[ing] leasing business from automobile dealerships and independent leasing companies within [his territory]." Pursuant to the GECC and BMW NA joint ventures, his job included some retail installment financing. A2427; * * * [citation to record deleted]. He also "provide[d] the BMW dealers with help on their leases and promotions," A2434, and provided BMW dealers with training and the necessary supplies to complete the leasing and financing paperwork. A2846. As the leasing agent for GECAL to BMW dealerships, he admitted, "I represent BMW Credit Corporation." A2872.

We conclude that Mitchell's statement, made as a representative of BMW Credit and BMW Leasing, may be attributed to BMW NA. The statement of a subsidiary may be attributed to its corporate parent, consistent with agency theory, where the parent dominates the activities of the subsidiary. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co. Ltd.*, 505 F.Supp. 1190, 1247–48 (E.D.Pa.1980). This evidence of the relationship between BMW NA and BMW Credit and BMW Leasing, while close, does suffice to confer agency status on Mitchell. BMW NA's ownership interests, control through corporate officers, advertising, and the subsidiaries' use of the BMW logo on their documentation, together indicate a sufficiently dominating interest in its subsidiaries.

As a further matter, the identity of the dealers referred to is sufficiently clear from the record. BMW NA's District Manager Martin Focht identified the members of the Philadelphia area dealer advertising group (DAG) as consisting of the following dealerships: Rosen, Otto's, Devon Hill, Sloane, DeSimone, Martin, Union Park, Thompson, Hans, and West German.

A1854. Mitchell specified servicing the following BMW dealerships from September 1985 through January 1986: Rosen, Otto's, Devon Hill, Thompson, Hans and West German. A2201–02. Braverman's account of Mitchell's statement conveys that Rosen referred to the area dealers, which would fairly comprise the area DAG. The evidence sufficiently identifies the source of the dealers' statements. *Contra Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1002 (3d Cir.1988) (an unidentified "they," who said something to the declarant, was insufficient).

■ The district court noted, as its second reason, that Mitchell was alleged to have made the statement "some two weeks *after*" BMW NA rejected Robert's application. We reject the theory that a statement evidencing the occurrence of concerted action may be inadmissible because it follows that activity. Although Mitchell's alleged statement to Braverman occurred on January 16, 1986, and after the decision to reject Robert's application was made, there is no evidence to support the conclusion that the dealers' statements to Mitchell followed the rejection of Robert's application. In addition, that a vicarious admission is disclosed after the fact does not defeat its admissibility. *See Mahlandt v. Wild Canid Survival & Research Center, Inc.*, 588 F.2d 626 (8th Cir.1978).

■ The Potamkins also assert that the dealers' statements to Mitchell are admissible under Fed.R.Evid. 801(d)(2)(E), the co-conspirator admission provision. In *United States v. Ammar*, 714 F.2d 238 (3d Cir.1983), *cert. denied, Stillman v. United States*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983), we comprehensively identified the requirements for such an admission: 1) independent evidence establishes the existence of a conspiracy and connects the declarant and defendant to it; 2) the statement was made in furtherance of the conspiracy; and 3) the statement was made during the course of the conspiracy. *Id.* at 245. The proponent must establish the first requirement by a "fair preponderance of independent evidence." *Id.* at 250. Mere association does not suffice but, on

the other hand, timing, circumstances, or one or a series of meetings, may. *Id.*

More recently, while not deciding the question of whether the challenged hearsay statement alone might adequately demonstrate conspiracy, the Supreme Court ruled that the conspiracy need not be exclusively proven by evidence *aliunde. Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987). *See United States v. Levy,* 865 F.2d 551, 553 (3d Cir.1989). Thus, for the first element, we may look to independent evidence plus the statement itself for evidence of a conspiracy. On appellate review, the witness' statements "must be accepted as true for the purposes of determining the sufficiency of the evidence." *Ammar,* 714 F.2d at 251. As well, the co-conspirator admission of Rule 801(d)(2) does not require personal knowledge. As noted by the Advisory Committee, Rule 801(d)(2) is designated as an admission against interest; its admissibility is premised upon our adversarial system rather than in reliance upon indicia of reliability or trustworthiness. *Id.* at 254; *see United States v. Castro,* 776 F.2d 1118 (3d Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986).

 Because the Potamkins have proffered evidence to show concerted action in violation of the Sherman Act, they have demonstrated the requisite conspiracy for admissibility under Rule 801(d)(2)(E). This judgment is entirely separate from the fact that both Mitchell and Rosen, in their deposition testimony, categorically deny the statements attributed to them in Braverman's testimony. At trial, the factfinder must decide which of the diametrically opposed witnesses is truthful.

Last, the district court reasoned that Braverman's testimony did not support an inference that dealer sentiment caused BMW NA's inaction on Robert's application. Memorandum Opinion at 10, 1990 WL 182340. We agree that as with the Gray affidavit, the Braverman testimony alone does present sufficient evidence from which a reasonable jury could find concerted action in violation of section one of the Sherman Act.

## IV.

 BMW NA provides a variety of reasons for allegedly independently rejecting the Potamkins as BMW dealers. The district court found these reasons compelling, on balance, when contrasted to the "19 bits" of evidence it attributed to the Potamkins.[11] To the contrary, although a jury may credit BMW NA's reasons, we cannot conclude that a reasonable jury would disbelieve the Potamkins' substantial rebuttal evidence. In light of BMW NA's many inconsistent reasons for denying the Potamkins a franchise, and assuming all credibility determinations in favor of the Potamkins at this juncture, we are satisfied that they have met their burden of proof.

Viewing the evidence in a light most favorable to the Potamkins while bearing in mind that an antitrust plaintiff must assert an economically sensible claim, we

---

**11.** These "19 bits" were identified as follows:

1. the letter rejecting Victor Potamkin's Great Neck application;
2. the affidavit of Harry Gray;
3. BMW NA's failure to differentiate among the various members of the Potamkin family;
4. and 5. Michael Jackling's and Terry Cronin's assertions that they did not want the Potamkins as dealers because they were "price discounters,";
6. Bruce Braverman's testimony about statements made by Don Mitchell;
7. BMW NA's alleged opposition to price advertising by its dealers;
8. dealers' cooperative efforts to enforce advertising standards;
9. evidence that BMW dealers had a strong motive to exclude [the] Potamkin[s];
10. the testimony of Michael Vadasz;
11. discussions of sales figures at dealer advertising group meetings;
12. groups of BMW dealers are organized into "Twenty Group" clubs;
13. BMW NA monitors the average profit margin for all dealers in each region;
14. allocation of vehicles;
15. the 1978 dealers' manual; consulting existing dealers about new applicants;
16. the testimony of Frank Ursomarso;
17. evidence that BMW NA conferred with other New York metropolitan dealers "concerning plans for the New York market";
18. evidence that BMW NA punished discounters by decreasing their allocations; and last,
19. BMW NA's aversion to the Potamkins.

turn to consider BMW NA's alleged independent reasons and the Potamkins' evidence that these reasons were pretextual. In sum, BMW NA alleges that the Potamkin image as high volume price-discounters was incompatible with the desired BMW image; the Potamkins' customer service record was inadequate; the proposed Philadelphia location was inadequate for a number of reasons; the Potamkins were uncooperative; and Robert objected to an annual allocation of 94 cars.[12] Indeed, when contrasted to BMW NA's earlier actions expressive of an interest in the Potamkins, the plethora of complaints pressed by BMW NA is both internally inconsistent and inconsistent with its concomitant treatment of BMW dealers. We turn to address BMW NA's alleged reasons for refusing to grant a franchise to the Potamkins.

### A.

As its primary reason for refusing to grant a franchise to the Potamkins, BMW NA asserts that the Potamkins threatened harm as potential "free rider" dealers. BMW NA mistakenly reads *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), to support its proposition that no liability could attach to its decision not to appoint the Potamkins as dealers. It contends that under *Sharp*, the Potamkins

must prove an agreement to fix prices or price level, and BMW NA maintains that it has not set price levels for its cars, although the record is replete with evidence that BMW NA representatives and dealers share and discuss retail price statistics. A1845; *see also* A2053; A2063–64. * * * [two sentences deleted].

Therefore, there is evidence of a concrete motive for dealer animus toward other dealers who would undercut a flexibly set price over invoice by advertising sales at, for example, $99 over invoice. Nevertheless, there is no direct evidence, only evidence from which a factfinder could infer, that BMW NA and its dealers have tacitly fixed prices for BMWs.

BMW NA further asserts that it does not prohibit its dealers from price advertising. *See, e.g.*, A135–37 (testimony of BMW NA's Mid–Atlantic Region Business Development Manager Robert Casella); A327–31 (testimony of BMW NA's Mid–Atlantic Region District Manager Martin Focht). In fact, numerous BMW dealers concurred that they are free to price advertise. *See, e.g.*, A420 (testimony of BMW dealer Gene Hoffman); A399 (testimony of BMW dealer Irv Green); A406 (testimony of BMW dealer Andrew Hill); A502 (testimony of BMW dealer Martin Lustgarten); A225 (testimony of BMW dealer Mario Cesarini). BMW

---

12. A November, 1985 memorandum from Robert Casella, Business Development Manager for the Mid–Atlantic Region, to Edward Robinson, BMW NA's Eastern Region Sales Manager, best articulates BMW NA's position:

> 1. Mr. Potamkin has not indicated a willingness to provide the necessary minimum operating requirements standards for Service and Parts.
> 2. It is not clear that proposed Potamkin BMW would be a distinct and separate operation allowing for the complete autonomy needed for a proficient and distinct BMW operation.
> 3. Mr. Potamkin has expressed an unwillingness to provide the necessary exclusive personnel required for the BMW operation.
> 4. As a dealer in Philadelphia, Pennsylvania, and through his association and vested interest in the Potamkin New York organization, Robert M. Potamkin brings a somewhat cloudy commitment to customer satisfaction and customer service, in addition, to publicly announced pending legal action for odometer

> tampering, advertising misrepresentation, and questionable leasing tactics. The above as evidenced by enclosed newspaper articles.
> 5. Mr. Potamkin has emphatically stressed that the guide of 94 units would not be acceptable. It is felt that at some time in the future our status at the proposed facility would be compromised and the BMW operation would be shuffled into secondary or less than adequate accommodations.

A1901.

In addition, many of those same reasons were provided to Green by Andrew Pokorny:

> ... Moreover, to date, Mr. Potamkin has been unwilling to agree to meet BMWNA's minimum standard operating requirements, and to accept an SPG of 94 units—the identical SPG you have. We are unwilling to accept any buyer not prepared to meet our minimum operating standards. In addition, Potamkin's action reflects a spirit of non-cooperation which is contrary to that required to build a good working relationship....

A869–70.

NA and its dealers do admittedly discourage other BMW dealers from engaging in price advertising because they view that practice as counterproductive given the preferences and demographics of a typical BMW customer. As one dealer explained, "The quality of the product is a factor, but you have to understand as a dealer who your customers are, what the demographics of the customers are and figure out how to handle that customer." A2470. Accordingly, customers spending more than $30,-000 for an automobile "don't want it thought of as a price item.... [I]t is an image thing, an association, an affinity with a fine product." A330. BMW NA's Senior Vice President of Operations, Michael Jackling, stated that BMW NA speaks with its dealers about advertising and about setting the appropriate tone.

> Because BMW is marketing a luxury product, BMW is very sensitive as to how that product is perceived in the marketplace, so ... that the product value itself is maximized through its image as well as its specification, performance and ownership qualities.

A450. * * * [one sentence deleted].

Thus BMW NA claims that the Potamkins' advertising style—prominently featuring prices and terms like "blow out sale" or "sellathon" A314–17; A915–28—is incompatible with the BMW image and heavily influenced BMW NA's decision to reject the Potamkins.

BMW NA misapprehends the legal parameters. In *Sharp,* the Court held that "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." Ruling after a trial in which the jury was instructed only on a *per se* theory of liability, the Court remanded the case for a new trial holding that *per se* illegality would not attach to a vertical non-price restraint and that "an agreement between a manufacturer and a dealer to terminate a 'price cutter,' without a further agreement on the price or price levels to be

charged by the remaining dealer," must be judged under a rule of reason test. 485 U.S. at 726, 736, 108 S.Ct. at 1520, 1526. Thus, even if this case is on all fours with *Sharp,* the Potamkins may still proceed to a jury trial under the rule of reason test.[13]

Moreover, this case has an additional horizontal component that *Sharp* lacked. In *Sharp,* a single dealer, Hartwell, pressured Sharp to terminate Business Electronics. Here the Potamkins pled in their complaint, and the evidence suggests, that a *number* of BMW dealers combined to form a group boycott to pressure BMW NA to reject Potamkin competition. The Potamkins assert that all of BMW NA's alleged reasons for rejecting them are pretextual and that until BMW dealers voiced their strenuous opposition to Potamkin competition, BMW NA had acknowledged the value of installing Potamkins as dealers. Thus the Potamkins present a horizontal boycott case, rather than the nonprice vertical restraint suggested by BMW NA. As we fully evaluate *infra,* the evidence of record, when viewed in the light most favorable to the Potamkins, supports their proposition.

*Sharp* suggests that the proper distinction between a horizontal and a vertical restraint lies in determining which kind of an arrangement produces the restraint rather than analyzing its anticompetitive effects. *Sharp,* 485 U.S. at 730 n. 4, 108 S.Ct. at 1523 n. 4. Under either analysis, however, when viewed in the light most favorable to the Potamkins, the evidence suggests that BMW NA rejected the Potamkins as a result of dealer opposition to price competition.

Last, *Sharp* also reflected the concern that fear of antitrust liability should not serve to inhibit a manufacturer's ability to expel "free riders" from its dealership body. BMW NA insists that it feared a "free rider" effect. As explained in *GTE Sylvania,* 433 U.S. at 55, 97 S.Ct. at 2560, this effect occurs when the "free riding"

---

**13.** Proof of anticompetitive effect is the hallmark of a rule of reason test, *see Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715 (3d Cir.1991) *cert. denied,* —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992), and it is well settled that protecting interbrand, rather than intrabrand, competition should be the goal of antitrust law. *GTE Sylvania,* 433 U.S. at 52, 97 S.Ct. at 2558.

retailer reduces or eliminates service to create price competition and a customer researches a purchase at a full service retailer but ultimately buys the product from the discounting retailer. BMW NA maintains that it feared just such an effect, emphasizing that quality service is crucial to its reputation and ultimate success. In support of its claim, BMW NA asserts that the Potamkin reputation evokes a high volume, price-discounting image. When viewed in the light most favorable to the Potamkins, however, the record suggests that this image incompatibility, as well, is simply pretextual.[14]

Indeed, there is evidence to suggest that the Potamkins would not have posed the "free rider" problem. Robert Potamkin asserts that he had been willing to conform to any service and facilities requirements that BMW NA demanded. Robert insists that he was willing to meet any BMW requirement, "if I could get somebody in authority to talk to me." A1974; 1977. Despite BMW NA's claims that Robert evidenced an uncooperative attitude, an internal BMW NA document acknowledged that Robert had promised to meet all required BMW standards. *See* A1998–99.[15]

**14.** In a letter to BMW dealer Irv Green, Andrew Porkorny, BMW NA's Vice President of Regional Operations and Sales, also provided as a reason for the decision that "Mr. Potamkin is not qualified," the following:

In general, it is clear to us that there is a fundamental incompatibility between the "BMWNA" corporate image and the "Potamkin" image, that the proposed buyer will not maintain the high commitment to customer service required by BMWNA, and that Mr. Potamkin will not properly represent BMWNA in the market place. As a result, the public and BMWNA will be harmed should your proposed transaction go forward.

A869. In an effort to prove that incompatibility, BMW NA has also produced the report of a private investigator, Earle Gay, which was prepared at the request of BMW NA's counsel during the pendency of Robert's application for the Green franchise. The Potamkins have provided sufficient evidence to render as a material factual dispute the genuineness of this "image" reason, however, especially as it relates to Gay's report.

First, combined with the other evidence to indicate that BMW NA never intended to consider Robert's application, there is no dispute that Robert's application was the first for which BMW NA hired a private investigator's services. A2288. Gay submitted his report directly to the Weil, Gotshal & Manges law firm and BMW NA decision-makers never received a copy of it. A2164. Further, from the information provided to Gay at the outset of his investigation a jury could infer that BMW NA was culling pretextual excuses to deny a Potamkin franchise. Gay testified that he was ordered to investigate consumer complaints, but not provided with favorable references furnished by Robert. A2292–98. Despite BMW NA's contention that applicant references are always favorable and therefore were considered less valuable for purposes of its investigation, Gay testified that in each subsequent investigation of a potential dealer, BMW NA furnished him with a copy of the application

and he checked positive as well as negative sources.

Moreover, BMW NA's thorough investigation into the Potamkins' business practices appears pretextual given its lack of interest in similarly investigating other prospective and existing dealers. For example, although Gay was asked to investigate all consumer complaints against the Potamkins, a 1981 lawsuit brought by the Pennsylvania Attorney General against several Toyota dealerships, who also owned BMW franchises, attracted no attention from BMW NA. One BMW dealer who entered into an "assurance of voluntary compliance" with the state Attorney General's Office testified that he did not receive an inquiry from BMW NA. A2040–41.

**15.** Another reason given by BMW NA pertained to alleged deficiencies in Robert's Philadelphia location. We note that these are no more extensive than those attributed to other prospective and existing dealers, and a reasonable jury may find that rationale for BMW NA's decision to have been pretextual. For example, one BMW dealer, John Thompson, whose franchise acquisition was conditioned upon relocation, received numerous extensions over several years. A2034–40. By contrast, BMW NA contends that the location of Robert's proposed facility was undesirable, as had been Green's location, and that BMW NA had planned to move that dealership point north into the more affluent suburban area where Sloane BMW was eventually opened. Yet, in contrast to the negotiations with and repeated extensions given to Thompson, BMW NA never informed Robert of this alleged deficiency. Robert also opined that his proposed facility, located at a busy crossroads frequented by residents of the northern suburbs, would have been an appropriate one.

Another dealer, Frank Ursomarso, conceded that he failed to meet a requirement of separate franchise facilities but has reached a compromise with BMW NA. A2465. For example, in response to one deficiency of which Robert was informed, lack of a customer service counter, he promised to build one to suit BMW NA. In

Additionally, only innuendo supports BMW NA's assumption that the Potamkins would have engaged in price advertising BMWs. In fact, one BMW NA "Inter–Branch Memo" reported that "[Robert] stated ... [he] has no intention of utilizing [price advertising] in [the Potamkin organization's] potential activity with the BMW franchise." A1989. Alan Potamkin also testified that each Potamkin franchise belonged to its corresponding Dealer Advertising Group, A2444; one could presume that Robert and Alan would have adhered to that practice and joined the Philadelphia area BMW NA DAG and its collective advertising efforts.

The record is equally clear that a number of BMW dealers did engage in price advertising on occasion. *See, e.g.* the testimony of BMW dealers: Green, A399; Hoffman, A409–10; Lustgarten, A500; Hill, A327–31. Although these dealers were "counseled" by District Manager Martin Focht and other BMW NA representatives, A327–31; A2210–12, sometimes at the behest of competing area dealers, price advertising remained an occasional practice. A327–31. Significantly, BMW NA ultimately granted a franchise to one dealer who displayed the same price advertising practices associated with the Potamkins.[16]

We do not mean to suggest that BMW NA had a responsibility even to consider the applications of the Potamkins. Clearly, as long as it acted independently, BMW NA could escape antitrust liability for its conduct. But the Potamkins have provided sufficient evidence of concerted action, and have raised genuine issues of material fact, which call into question BMW NA's statement of reasons for rejecting the Potamkins. There is no evidence that the Potamkins' service and facilities would not have equalled those of other qualified dealers

and applicants, *see supra*, notes 14–15; however, and there is sufficient indication that the alleged concerted action between BMW NA and its dealers may have diminished retail competition without a corresponding benefit to consumers. Moreover, like the manufacturer's reversal of opinion in *Arnold Pontiac*, BMW NA's conduct is inconsistent with all of the evidence that BMW NA's Eastern Regional Manager Cronin negotiated with Victor Potamkin in good faith, and even after Victor allegedly tried to bribe Cronin, Cronin allegedly encouraged Robert to buy Green's Philadelphia franchise. If proven at trial, the fact that the Philadelphia area dealers, like the New York area dealers, were familiar with the Potamkins' success as high volume price discounters and feared that kind of competition, would make sense of BMW NA's reversal of opinion with respect to the Potamkins.

### B.

Another of BMW NA's reasons for rejecting Robert Potamkin's application for the Philadelphia franchise was his alleged challenge to the number of cars he would be allotted annually. When BMW NA field personnel took his application in late October of 1985, Robert qualified his signature on the "New Dealer Information and Requirements" form, with the typed notation: "I do not accept Irvin Green's SPG (planning guide). It is unreasonable." A1207. This notation became one of the primary reasons cited for BMW NA's rejection of Robert's application.

While the precise definition of the SPG remains in dispute, the parties agree that a dealer's SPG serves as a guide to the number of BMW automobiles allotted to it annually. A dealer's SPG is derived from

---

contrast, BMW NA's District Parts Manager John Graynor indicated to Robert and his parts manager that BMW required an exclusive BMW parts manager and counted their disagreement as a deficiency; yet Robert was never informed that many BMW dealerships satisfied that requirement by assigning one assistant parts manager exclusively to the BMW franchise. A1916–18.

16. Although BMW NA rejected BMW dealer Robert Ciasulli's initial application for a franchise in a 1981 proposed buy-sell agreement, citing a "perceived lack of commitment to customer satisfaction," A2214, and again in 1986, citing concerns nearly identical to those invoked when rejecting Robert's application, A2229–30, the record indicates that Ciasulli subsequently received the Mack BMW franchise in Toms River, New Jersey. A2377; 2307–08.

both the number of cars available from the German manufacturer and BMW NA's assessment of the sales requirements and service capacities of each dealership. BMW NA has been imprecise in defining the SPG throughout this litigation, * * * [one clause and one sentence deleted].

In October of 1985, before Robert Potamkin made the notation, Robert Casella, BMW NA's Regional Business Development Manager, informed Robert that Green's dealership carried with it an SPG of 94. A171–72; A1999. Despite Casella's view that the SPG serves merely as a guide or a forecast, (in his words, "I'm not aware that it has [limited allocations] but it could," A1803–04), he did not convey that to Robert. A171–72; A1999. The BMW NA representatives who subsequently evaluated Robert's proposed facility were unqualified to negotiate the SPG and also declined to explain it. A632. Robert explained that he refused to sign without reservation, and thereby to obligate himself to, a form that indicated an annual cap of 94 BMWs, before he could speak to someone in authority at BMW NA. He testified that he signed the form with the notation so as to comply as fully as possible with BMW NA requirements, but he did not want to be bound by a figure that he felt had been neither adequately explained nor justified. A910–12. His notation was received as evidencing an uncooperative attitude, yet it is undisputed that no one from BMW NA inquired of Robert concerning his notation. A869–70.

BMW NA has explained, however, that the SPG of 94 conformed with corporate policy. According to Phil Caposella, Mid–Atlantic Regional Manager in 1985, when a dealer acquires a dealership through a buy-sell agreement, he inherits the same SPG as the seller. A111; see A171–74; A495. The SPG is thus neutral and serves neither to inflate or deflate the price of the dealership during the transaction. A new dealer may, however, anticipate an increased SPG after, for example, demonstrating an ability to accommodate a higher "rate of travel" (actual sales), A98–99; A490–91, or expanding or enhancing its facility. A337–38.

Nonetheless, there is substantial evidence which shows that the SPG did not limit actual allocations of cars. Green's eventual successor, Sloane BMW, while nominally bound by an SPG of 94, A1898, actually obtained approximately 400 BMWs a year. A1830. An internal BMW NA memorandum suggests that the decision to hold Sloane BMW to a nominal SPG of 94 was motivated by this litigation. A1898. In fact, District Manager Focht praised Sloane for selling more than 101 BMWs during its first three months of operation. A2305. BMW dealer Sloane's experience is consistent with that of another BMW dealership manager, Michael Vadasz, that his SPG never limited the number of cars he would be able to sell, A793; see, e.g., A1887–88 (Focht), and of dealer Andrew Hill of Devon Hill Motors. A2118–20. In fact, Hill believed that the SPG equals approximately one-half of a dealer's actual allotment. A2124. And BMW NA's President, Gunter Kramer indicated, the "actual allocation is also determined by rate of travel," unless that rate indicates price discounting. A491. None of this was explained to Robert; he was simply told that his SPG would be 94 and no more.

Moreover, Robert indicated that he had been willing to meet any BMW NA criteria, including renovations to his proposed facility, to meet standards required for a higher SPG, and had so informed Casella. A1708–09; A1719; A1999. As evidence, Robert produced the cover letter submitted with his application to Casella, BMW NA's Mid–Atlantic Region Business Development Manager. In relevant part, Robert wrote:

> On Tuesday I gave you a copy of plans for a facility in which we could put our BMW dealership. As we discussed, facility size and car numbers go hand in hand. That facility could be used exclusively for BMW in both sales and service if we get enough cars to support it. If we get a smaller number of cars, we could use the showroom for both BMW and VW and the service department for BMW exclusively. We will consider both smaller facilities and larger facilities as the number of cars dictates.

A1719. In contrast to BMW NA's theory of noncooperation, Casella's own internal BMW NA memorandum reflects Robert's willingness to meet any requirements. A1998–99.

### C.

Integral to BMW NA's theory of the case is its assertion that during the early 1980s, BMW NA was initiating a dealer "upgrade" program. This involved targeting items for improvement, gradually improving deficient aspects of existing dealerships, and requiring improved standards of prospective franchise applicants. BMW NA also faults Robert for planning to place his BMW dealership in an "automall" adjacent to Robert's other dealerships. * * * [one sentence deleted].

The Potamkins proffer significant evidence suggesting that this reason, as well, is pretextual. First, and most importantly, the Potamkins produced a letter addressed to Business Development Manager Casella, that Robert had expressed an interest in making his BMW facility exclusive if he received the number of cars necessary to make it profitable. A1719. Despite this invitation, Robert stated that he was not asked to make the dealership exclusive. *See* A1710–11. Second, many other BMW dealers operated multi-franchise dealerships and, contrary to BMW NA's implication, BMW NA appeared unconcerned, and in some cases even unaware, of the additional franchises * * * [one sentence deleted].

Finally, Casella opined that with an SPG of 94, Robert would be likely to "shuffle" his BMW franchise to less accommodating facilities, A194–95, tacitly acknowledging that with an SPG of 94 a BMW dealership would have been only marginally profitable. In addition to BMW NA's intent to hold Robert to a 94 SPG, as contrasted with the treatment accorded other dealers, this decision makes little economic sense for BMW NA. Accordingly, BMW NA's President, Gunter Kramer, acknowledged BMW NA's emphasis on dealership profitability. *Cf.* A480–81.

Finally, BMW NA's alleged concern that Robert's dealership was not to be an exclusive one is weakened by the testimony of BMW NA representatives that in 1985, the definition of an "exclusive" dealership had not yet been clarified. Prior to the arrival of Vice President and Director of Operations, Jackling, an "exclusive" dealership could consist of a different building from, even if physically attached to, other franchises. Over time, this concept evolved to require that the BMW franchise would stand alone entirely. In 1985, however, Robert's proposed BMW showroom and service area would have met the first definition of "exclusive."

### D.

In summary, although BMW NA offers a wide variety of reasons for having rejected the Potamkins as BMW franchisees, it has failed to meet the standard of proof necessary for summary judgment. The Potamkins have countered each alleged reason with evidence that both discredits BMW NA's witnesses and provides independent support for the Potamkins' claim that BMW NA and its dealers acted in concert to repel any Potamkin competition in BMW sales.

Because the Potamkins have adduced sufficient evidence to support their federal antitrust claim, we will vacate the order granting summary judgment on Count I and remand the case for further pretrial proceedings. As well, the judgment with respect to Counts IV and V, dismissed pursuant to the disposition of Count I, will be vacated and remanded.

### V.

In Count III, the Potamkins also claim that BMW NA tortiously interfered with their contract and prospective contractual advantage to purchase the Green and Trans-Atlantic dealerships, respectively. The district court granted BMW NA summary judgment on this claim as well, concluding that the Potamkins lacked an enforceable contract in either case absent BMW NA's approval and that BMW NA was privileged not to offer its approval.

### A.

The parties apparently agree that sections 766 and 766B of the Restatement (Second) of Torts, adopted by both New York and Pennsylvania, govern.[17] *Guard–Life Corp. v. S. Parker Hardware Mf'g Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 631, 406 N.E.2d 445, 448 (1980); *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1183–1184 (1978); *see Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979).

With respect to the Green agreement, we look to section 766, entitled, Intentional Interference with Performance of Contract by Third Person, which provides:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts, § 766 (1979). Factors delineating the contours of "improper" conduct are set forth in section 767,[18] and include the nature of the actor's conduct and intent.

As articulated by the Pennsylvania Supreme Court, proper conduct may be described as "socially acceptable conduct" that comports with the "'rules of the game' which society has adopted." *Adler, Barish*, 482 Pa. at 433, 393 A.2d at 1184.

Because only an agreement in principle had been reached during the Trans–Atlantic negotiations, section 766B, Intentional Interference with Prospective Contractual Relation, governs that claim:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979). Having set forth the applicable legal principles, we turn to the parties' contentions.

### B.

With respect to the Green agreement, BMW NA urges that absent a valid, enforceable contract, the Potamkins would not have a claim for tortious interference. Likewise, BMW NA claims that a higher standard is required for a prospective contractual advantage, and that, concerning Trans–Atlantic, it has also not been met. To the contrary, the Potamkins contend that if we reverse the antitrust claim in their favor, they have, *a fortiori*, presented material factual issues on the question of

---

**17.** The parties have not addressed the question of choice of law. It remains true that if New York law governs the Trans–Atlantic incident (prospective contractual advantage) and Pennsylvania law governs the Green agreement (contractual relationship), then the Restatement (Second) of Torts, as adopted by each jurisdiction, would apply. We will proceed on that assumption.

We note, however, that if Pennsylvania law were to control the prospective contractual advantage claim, proper recourse should be made to section 766 of the Restatement (First) of Torts. *Silver v. Mendel*, 894 F.2d 598, 601–02 (3d Cir.), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

**18.** They include:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interest of the other with which the actor's conduct interferes,

(d) the interest sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties.

Restatement (Second) of Torts, § 767 (1979).

whether BMW NA's interference amounted to actionable "improper" conduct.

Although variously couched as a "privilege to interfere, or interference not improper," the Restatement provides that "[t]he issue in each case is whether the interference is improper or not under the circumstances...." § 767, comment b. Further, "[a] determination of propriety requires inquiry into the 'mental and moral character of the defendant's conduct.'" *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159 (3d Cir. 1988).

Some stated examples of improper conduct are particularly germane. In one, "conduct that is in violation of antitrust provisions or is in restraint of trade" may constitute improper interference. Restatement (Second) of Torts, § 767 comment on clause (a). Economic pressure, such as that allegedly applied to Caufield when BMW NA bought Trans–Atlantic at a significantly lower price than the Potamkins had offered while suggesting that she had nothing to sell without its approval, may constitute unprivileged, improper interference. BMW NA's allegedly disingenuous delay in taking Robert's application for the Green franchise, if found by the jury to have violated the Pennsylvania Board of Vehicle Act and to have been sufficiently intentional, could also constitute improper interference. Because the factual underpinnings of these tort claims are intertwined with the antitrust claims, we will vacate the district court's judgment with respect to them and remand them as well.

### VI.

In its cross-appeal, BMW NA challenges the district court's denial of summary judgment on Count II, alleging a violation of the Pennsylvania Board of Vehicles Act, 63 Pa.Stat.Ann. § 818.1, *et seq.* Although BMW NA presented a multifaceted attack on this claim in its motion before the district court, on appeal it has confined its challenge to the single question certified by the district court: "Does a prospective purchaser of an automobile dealership have standing to pursue a claim under the Penn-

sylvania Board of Vehicles Act ... against a franchisor who withholds its consent to the transfer of a franchise?" (citations omitted). The Act provides for liability where a franchisor has acted so as to:

(3) Unreasonably withhold consent to the sale, transfer or exchange of the franchise to a qualified buyer capable of being licensed as a new vehicle dealer in this Commonwealth [, or]

(4) Fail to respond in writing to a request for consent as specified in paragraph (3) within 60 days of receipt of a written request.... Such failure shall be deemed to be refusal to consent to the request.

63 Pa.Stat.Ann. § 818.9(b)(3) and (4). Section 20 provides for civil actions:

Notwithstanding the terms ... of any agreement ..., [i] any person who is or may be injured by a violation of a provision of this act or [ii] any party to a franchise who is so injured in his business or property by a violation of a provision of this act relating to that franchise or [iii] any person so injured because he refused to accede to a proposal for an arrangement which, if consummated, would be in violation of this act, may bring an action for damages and equitable relief, including injunctive relief, in any court of competent jurisdiction.

63 Pa.Stat.Ann. § 818.20(a) (bracketed numbers added for purpose of explanation).

Since this count raises an issue of Pennsylvania law, our duty is to predict how the Pennsylvania Supreme Court would decide this issue. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir.1990); *see Commissioner v. Estate of Bosch*, 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967). We must make this prediction without the benefit of substantive legislative history or Pennsylvania caselaw concerning this standing provision of the Board of Vehicles Act. Lacking direct guidance on the interpretation of this Act, we turn to the general instructions of Pennsylvania's Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1501 *et seq.* (Purdon's Supp.1991). The Statutory Construction Act provides that we should construe

the Act "to give effect to all its provisions," and further provides that "when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(a), (b) (Purdon's Supp.1991).

Given this guidance from the Pennsylvania legislature, we conclude that the clause providing that "any person who is or may be injured by a violation of a provision of this Act ... may bring an action ..." plainly confers standing upon the Potamkins.

BMW NA contends that the Act protects only franchisees' economic interests by leveling the playing field between franchisees and manufacturers, and therefore does not impose on manufacturers any duty to *prospective* franchisees. While this contention has some appeal, we reject it because it is inconsistent with the plain language of section 818.20. Second, BMW NA contends that the standing conveyed to "any person who is or may be injured ..." by section 818.20(a), must be read narrowly so as to avert rendering unnecessary the standing conveyed in the following clauses. In other words, if "any person who is or may be injured" were broadly construed to encompass the Potamkins, the following clauses would not enlarge the class of litigants. BMW appears to suggest that "any person who is or may be injured" refers to violations of the statute *other than* those relating to regulation of franchises.

The Act does not support BMW NA's position, however, and BMW NA has not cited any binding or even persuasive cases. In none of the cases BMW NA cites did the courts construe a statute similarly broad in granting standing to "any person." At least with respect to the standing provision in clauses one and three BMW NA's concern that the first makes the remaining clauses superfluous is misplaced. The concern of the first clause is injury caused by violation. The concern of the third, providing standing to "any person so injured because he refused to accede to a proposal for an arrangement which, if consummated, would be a violation of this act," is injury caused by refusal to participate in a

violation; no actual violation need occur. Even if the first clause covered every conceivable violation, some additional persons could sue under the third clause.

BMW NA also asserts a policy argument, predicting that if the court opens the door to prospective franchisees, manufacturers will be afraid to deny applications, even reasonably, for fear of litigation. Where manufacturers have acted reasonably, however, they have not only the defense of reasonableness, but in litigation brought in the federal courts, the protection of Rule 11 as well. Moreover, the fear of litigation is not alien to car manufacturers nor limited exclusively to them; they are subject to all kinds of liabilities—product, negligence, and, even under this statute, liability to franchisees. These are subsumed in the cost of doing business and from society's viewpoint have favorable aspects which outweigh the negative ones.

In sum, we will not diverge from the plain language of the Pennsylvania Board of Vehicles Act's standing provision, especially where we cannot find support in legislative history or caselaw for doing so.

## VII.

We will therefore vacate the grant of summary judgment on Count I, vacate the dismissal of Counts III, IV and V, and affirm the district court's order with respect to Count II, remanding all counts for further proceedings.

ROTH, Circuit Judge, concurring and dissenting:

I join part VI of the majority's opinion and judgment which affirms the denial of summary judgment on the Potamkins' claim under the Pennsylvania Board of Vehicles Act. However, I respectfully dissent from the majority's disposition of the Potamkins' antitrust and tortious interference with contract claims. In regard to the antitrust claim, I conclude that the plaintiffs have not met their burden of producing evidence which tends to show that the distributor, BMW NA, had entered into a conspiracy with its dealers to boycott the Potamkins. More significantly, I find that

plaintiffs have not met their burden of producing evidence that tends to exclude the possibility that BMW NA was acting independently of its dealers when it rejected the Potamkin dealerships. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). There is no evidence of a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.; Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). I would, therefore, affirm the summary judgment entered against the Potamkins on their Sherman Act § 1 claim. Because the basis for the tortious interference with contract claim is so closely interwoven with the antitrust claim, I further conclude that it must fall with the failure of the antitrust claim. I would, therefore, affirm the grant of summary judgment on that claim as well.

Turning first to the antitrust claim, I believe the majority has misread our standard for summary judgment when it allows the Potamkins' antitrust claim to go forward. As the majority acknowledges, an antitrust plaintiff must be prepared to demonstrate a causal relationship between alleged dealer complaints *and* a distributor's action in order to distinguish concerted action in violation of the Sherman Act from "perfectly legitimate" independent conduct. *Monsanto*, 465 U.S. at 763–64, 104 S.Ct. at 1470–71. However, the present case differs from situations such as that in *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564 (3d Cir.1986), where we were able to find such a linkage. In *Arnold Pontiac*, there was direct evidence of concerted action which was coupled with circumstantial evidence that GMC had planned to grant Arnold Pontiac–GMC a Buick franchise but changed its mind after a meeting between its representative and the local dealers. We found that the combination of direct and circumstantial evidence raised a genuine issue as to whether the Buick dealers had conspired to thwart

competition at the dealership level. For this reason, we reversed the grant of summary judgment and remanded the case for trial.

Our careful review of the record here shows no direct evidence of a conspiracy that allegedly caused the Potamkins their injury. We are left to infer from only circumstantial evidence whether there was concerted action. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). As I relate below, I find that BMW NA's conduct is as consistent with permissible unilateral conduct as it is with illegal conspiracy, and therefore, following *Matsushita*, I find that the evidence is not adequate to support the alleged antitrust conspiracy.

The evidence here suggests at most that at different times New York area and Philadelphia area dealers may have complained to BMW NA about awarding dealerships to the Potamkins. Yet, in *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470, the Supreme Court rejected the notion that a jury could infer the existence of a price-fixing agreement from the complaints of other distributors or "from the fact that termination came about 'in response to' complaints" from other distributors. The Court required something more of section 1 plaintiffs: Evidence that "tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471; *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir. 1985).

The Court explained that a plaintiff does not establish an illegal price-fixing agreement solely by proof of complaints by competitors of the prospective dealer. Complaints about discounters [1] "are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470. A distributor's decision not to deal may re-

---

**1.** The Potamkins had been long recognized for selling high volumes of automobiles at discount prices.

flect a restraint which is primarily horizontal in nature, in that dealers are trying to suppress competition by utilizing the power of a common supplier. Nevertheless, so long as the distributor made an independent business decision not to do business with a dealer, the fact that the distributor was aware of the dealers' complaints is of no moment. *Id.* at 763–764, 104 S.Ct. at 1470–71.

In looking at all of the evidence which the Potamkins present, I understand we cannot compartmentalize the various factual components. However, neither can we read between the lines to infer linkage where there is none. When drawing inferences, we may draw only reasonable inferences from sufficient evidence. For the reasons which follow, I conclude that the Potamkins have not presented the quantum of evidence necessary to permit their case to go to the jury. In reaching this conclusion, I heed the *Monsanto* Court's warning that allowing finders of fact to infer conspiracies from extremely equivocal evidence may deter pro-competitive conduct:

> If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrines enunciated in *Sylvania* and *Colgate* will be seriously eroded.

*Id.* at 763, 106 S.Ct. at 1470.

Evaluating the evidence in the present case in the light most favorable to the Potamkins, I conclude that a jury could not find a violation of section 1 of the Sherman Act without relying on speculation or conjecture, a result we have cautioned against. *Edward J. Sweeney,* 637 F.2d at 116.

When examined closely, the Potamkins' evidence is slender. With regard to the alleged 1981 conspiracy, the Potamkins present the Gray affidavit along with the statement of Robert Potamkin to support an inference of concerted action. As the majority notes, the Gray affidavit contains no evidence that BMW NA considered the dealers' alleged demands or acted in response to those demands. Nevertheless,

the majority reads the affidavit to support an inference that BMW NA knuckled under to dealer pressure. Taking the affidavit together with the other evidence the Potamkins present, I cannot draw such an inference. Gray's testimony relates only Gray's own belief that BMW NA's decision to deny the Potamkins the Great Neck open point came as a result of the New York-area BMW dealers' objections. The affidavit neither mentions whether a BMW NA employee participated in the meeting at which dealers discussed complaining to BMW NA nor supports an inference that the dealers had formed an agreement to pressure BMW NA or its Eastern Regional Manager, Terry Cronin.[2] The affidavit relates only that dealers at the meeting opposed BMW NA's granting the Potamkins a franchise, a sentiment which is not surprising from dealers who would face new competition if the franchise were granted.

Even if a representative of BMW NA were present at the dealer advertising group meeting, such contact between a distributor and its dealers, while evidence of an opportunity to conspire, does not amount to a conspiracy. Our case law suggests such meetings have important business purposes; they provide the distributor or manufacturer with important information which can be used to change product mix or advertising direction. Distributors and dealers must speak "to assure that their product will reach the consumer persuasively and efficiently." *Monsanto, supra,* 465 U.S. at 763–64, 104 S.Ct. at 1470.

As further evidence of concerted action by New York area dealers, Robert Potamkin offers his own statement that in late 1985, Gene Hoffman, a BMW dealer in Bloomfield, New Jersey, told him that BMW NA's decision to deny the Potamkins the Great Neck franchise "was due to the fact that other Long Island BMW dealers feared the price competition that a Potamkin BMW franchise would bring to the Long Island market." I do not find that

---

**2.** The affidavit suggests that some dealers had complained to Cronin prior to the meeting and that others complained following the meeting.

There is nothing to suggest a meeting of the minds followed by concerted action.

this evidence enhances the Potamkins' conspiracy claim. Again, all businesses fear competition, particularly from a new competitor who will compete on price. Moreover, I do not read Robert Potamkin's affidavit to suggest that Hoffman told him that BMW NA consented to an agreement with its Long Island dealers to exclude the Potamkins.[3] Robert Potamkin's affidavit, even when considered with the Gray affidavit, does not present evidence which tends to exclude the possibility that BMW NA acted unilaterally to keep the Potamkins out of Long Island.

* * * [one sentence deleted].[4] However, even if BMW NA did contact existing dealers, a conclusion refuted by the testimony of Cronin and Hoffman among others, such evidence, when taken together with the Gray and Robert Potamkin affidavits, still does not raise an inference of concerted action between BMW NA and its New York area dealers to deny the Potamkins a franchise. At a minimum, "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design or understanding, or a meeting of the minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). BMW NA's own decision to contact its dealers would not meet the Potamkins' burden of having to show that BMW and the dealers had acted with a common design.

Finally, it must be remembered that the 1981 allegations are not part of the antitrust injury complained of here; the Potamkins use those allegations to suggest a pattern of dealing that supports their claim of concerted action arising out of the events of 1985.

With regard to those 1985 events surrounding the Potamkins' inability to obtain a BMW franchise in Manhattan, the evidence which the Potamkins present is very thin. To suggest concerted action, the Potamkins offer only Robert Potamkin's statement that Gene Hoffman had informed him on May 30, 1986, that a BMW NA representative had visited Hoffman in the fall of 1985 and had asked Hoffman's opinion about the proposed sale of Trans-Atlantic to the Potamkins. Based on this evidence, the Potamkins argue that dealer opposition from 1981 was reactivated in 1985 to defeat their agreement in principle with Caufield for the Trans-Atlantic dealership in Manhattan. Even if Hoffman had complained to a BMW NA representative—Hoffman denies that any representative of BMW ever visited him regarding the possible sale of a dealership in Manhattan to the Potamkins—and even if a BMW NA representative heard similar complaints from other dealers—there is no evidence supporting this point in the record—complaints by competitors, standing alone, are not sufficient to show a conspiracy.[5]

As for other evidence of a 1985 New York conspiracy, the majority notes that BMW NA backed away from its strategy of creating a factory store and instead gave Martin BMW the exclusive Manhattan dealership. However, the factory store concept was not invented to cover up the conspiracy. The uncontroverted documentary and deposition testimony suggests that BMW came up with the idea at least one year prior to the proposed sale of Trans-Atlantic. In short, I find the evidence insufficient to deduce a conspiracy between BMW NA and its New York dealers to deprive the Potamkins of a BMW dealership in Manhattan.

Finally, the evidence that BMW NA conspired with its Philadelphia dealers to prevent the Potamkins from purchasing the Green dealership is equally scant. It stems from one source: the statement of Bruce Braverman, a Potamkin employee, recount-

---

3. Because I am looking at this evidence in the light most favorable to the Potamkins, I will not consider the credibility of this affidavit or of Hoffman's responding affidavit, which denies Robert Potamkin's allegations.

4. * * * [one sentence deleted].

5. I do not suggest that evidence of complaints has no probative value at all, but only that the burden remains on the antitrust plaintiff to introduce additional evidence sufficient to support a finding of unlawful contract, combination, or conspiracy. *Monsanto*, 465 U.S. at 764 n. 8, 104 S.Ct. at 1471 n. 8.

ing what Donald Mitchell allegedly had told him. I do not agree with the majority's conclusion that the Braverman statement is admissible evidence. Nor can I conclude that the district court abused its discretion in excluding the Braverman statement. *See, e.g., United States v. Gambino,* 926 F.2d 1355, 1364 (3d Cir.1991). However, even if his statement were admissible, I find that it offers little evidence of the alleged conspiracy.

The majority goes to great lengths to find Braverman's testimony admissible. Yet, I cannot agree with its reasoning for several reasons. First, I find that Braverman's statement of what Mitchell told him should not be admitted as an exception to the hearsay rule because Mitchell does not qualify as an agent of BMW NA acting within the scope of his agency and employment. Second, I find that Braverman's statement also falls short of the exception for the admission of hearsay statements by co-conspirators. Furthermore, even if the Braverman relation of the Mitchell statement is admissible evidence of a conspiracy, it relates only to a conspiracy between BMW dealers, which is not the conspiracy charged in the complaint. The statement does not refer to BMW NA's role in any such scheme.

The record suggests that Mitchell worked for BMW Credit Corporation * * * [remainder of sentence deleted]. In his work for BMW Credit, Mitchell had no contact with BMW NA and nothing to do with its decisions on dealer appointments. Therefore, I do not believe that Mitchell's statement to Braverman concerned a matter within the scope of his agency, such that Braverman's retelling should be admissible under Rule 801(d)(2)(D).

In any event I do not find that BMW NA so dominates the activities of BMW Credit that Mitchell could act as BMW NA's agent. The majority finds this a close question. I think the answer is clear. * * * [four sentences deleted].

Moreover, even if Mitchell could have spoken as BMW NA's agent, the admissibility of Braverman's statement is cast into doubt by the multiple layers of hearsay contained within Mitchell's statement as Braverman relates it. As the majority indicates, our case law allows secondary and tertiary levels of hearsay to come in if there is a basis for admitting the hearsay statement. *See* Fed.R.Evid. 805. Braverman testified in his deposition that he remembers Mitchell telling him that Don Rosen was the source of Mitchell's news that other Philadelphia area BMW dealers were going to do what they could to make certain the Potamkins did not get a franchise. However, I do not find that the out of court statements purportedly made by other dealers to Rosen, who then repeated them to Mitchell, should be admissible in light of our concern for restricting declarations of unidentified persons. Even where we might infer who such persons may be, such supposition does not satisfy the heavy burden on the proponent of the evidence to demonstrate its trustworthiness. *See Carden v. Westinghouse Elec. Corp.,* 850 F.2d 996, 1003 (3d Cir.1988). We do not know the identity of the other dealers who presumably spoke to Don Rosen, nor do we know whether it was Don Rosen himself or someone else at his dealership who spoke to Mitchell. I note that Mitchell indicated that he did not usually talk to dealership owners when he visited his accounts. Moreover, the nonhearsay evidence contradicts Braverman's testimony. Mitchell denies having made the statements attributed to him by Braverman, and Don Rosen denies having told Mitchell that Philadelphia area BMW dealers had complained to BMW NA about the possibility that the Potamkins would become a dealer.

I also conclude that the Mitchell "statement" is not admissible under the co-conspirator exception, Rule 801(d)(2)(E). I do not find, either within the statement or independent of the statement, any evidence of a conspiracy involving BMW NA *and* the Philadelphia area BMW dealers. Nor do I find that Mitchell held a position relative to BMW NA that could implicate BMW NA in such a conspiracy through Mitchell's actions.

For each of the above reasons, I believe the district court did not err in excluding

Braverman's statement. However, even if the trial court did abuse its discretion by ruling that the Braverman testimony was inadmissible, our consideration of the statement in connection with the motion still would not preclude summary judgment for the defendants on the antitrust claim. In the statement, Braverman asserts that Mitchell told him that the Philadelphia area dealers did not want the Potamkins to have a franchise because they feared price competition. Yet, at his deposition, Braverman responded in the negative to questions regarding whether he knew if Mitchell had spoken to anyone at BMW NA and whether Mitchell knew if the Philadelphia dealers had spoken to anyone at BMW NA about the proposed sale. These negative answers suggest that Mitchell was relating nothing more than the grumbling he heard in his conversations at BMW dealerships. Braverman's testimony provides no hint that BMW NA acted other than unilaterally when it chose not to approve the sale of the Green dealership to the Potamkins. Nothing in what Braverman says Mitchell told him suggests that the dealers communicated demands to BMW NA or that BMW NA acquiesced in those demands or entered an agreement with the Philadelphia area dealers to keep out the Potamkins.[6]

I recognize, of course, that it is rare to find overt evidence of a conspiracy. I note as well that BMW NA may have been both slow and disingenuous in its handling of the Potamkins' application for the Philadelphia franchise. However, BMW NA's failure to consider the Potamkin's application in a prompt and scrupulous fashion does not constitute evidence of a conspiracy.

Beyond the evidentiary problems relating to concerted action, I believe the majority understates the four-year gap between the events surrounding BMW NA's failure to award the Potamkins the Great Neck open point in 1981 and the failed attempts by the

Potamkins to purchase dealerships in Manhattan and Philadelphia in the fall of 1985. I find the causal nexus between the 1981 actions and the events of 1985 too attenuated to support the existence of the alleged conspiracy. There is no evidentiary link showing that the alleged 1981 agreement between New York area dealers and BMW was reactivated to keep the Potamkins out of Manhattan in 1985. Even more apparent is the lack of any evidence which supports even an inference that the purported conspiracy from 1981 to deny the Potamkins the Great Neck open point could have been reactivated in 1985 to deny them the Green dealership in Philadelphia. Previously, we have required of plaintiffs "proof of a causal relationship between competitor complaints" and the decision not to deal. *Edward J. Sweeney & Sons*, 637 F.2d at 111. Plaintiffs have failed to meet this same burden of proof here.

Moreover, the relevant literature suggests that the defendant had credible business reasons for rejecting the Potamkins' dealership applications. BMW NA had an interest in protecting its reputation and the image it has attempted to develop as a high quality car distributor. In order to compete with other brands in the market for luxury automobiles, BMW NA had ample reason to want to insure that its products were offered with certain point-of-sale services. BMW NA could have feared that the introduction of a dealer who "sells at the factory gate" would lead its other dealers to lower the level of service they offered in order to compete better with the price-cutter and prevent the price-cutter from free riding on the services they provided.[7] Finally, BMW NA may have acted in a desire to protect the investments its dealers had made in their own franchises. Had BMW NA's rejection of the Potamkins' applications lacked a sensible economic justification, plaintiffs' allegations of concerted action would be more compelling.

---

**6.** In addition, I note that, while the majority opinion focuses on the dealer interactions with BMW NA, it overlooks the paucity of evidence showing that the dealers had conspired together to form an anticompetitive scheme.

**7.** A review of the depositions and exhibits makes clear that both BMW and its dealers had reason to fear a price cutting Potamkin franchise. The Potamkins had built a huge retail business by selling cars in high volume at small markup over the prices paid to various manufacturers.

While the Potamkins assert that any business justification and, indeed, BMW NA's claim of unilateral action is mere pretext, plaintiffs' allegations must be better supported in the record to survive a motion for summary judgment.

I recognize that the Potamkins have not rested on their conclusory assertions of conspiracy in the face of BMW NA's proffer of substantial evidence supporting plausible and legitimate explanations for its conduct. Instead, the Potamkins have gone further, as the majority relates, to challenge these explanations one by one. I find these challenges unavailing for two reasons. First, I am convinced we need not examine the plausible reasons put forward by the defendant when the circumstantial evidence relied on by the plaintiff does not support a conspiracy claim. Second, the mere fact that the Potamkins can question the business reasons advanced by BMW NA for not awarding the Potamkins any of the franchises does not, by itself, justify the inference that BMW NA's conduct was therefore the result of a conspiracy. Even if a distributor, acting independently, gave inaccurate reasons for its decision not to award a franchise, whether because of a desire to avoid controversy or some other reason, its actions would not violate the antitrust laws absent a conspiracy. And *Monsanto* teaches us that such a conspiracy cannot be inferred from highly ambiguous evidence.

In my view, a rigorous application of the test set forth in *Monsanto* requires that we affirm the grant of summary judgment to BMW NA on the Potamkins' Sherman Act § 1 claim. The majority resists the application of such a stringent test. Nevertheless, to the extent that the burden on a section 1 antitrust plaintiff to produce evidence supporting an inference of concerted action is a significant one, this is so because of the standard set forth in *Monsanto*.

Finally, I would also affirm the district court's dismissal of the tortious interference with contract claim. Tortious interference with contract, or with prospective contract, requires intentional and improper conduct. Restatement (Second) of Torts §§ 766, 766B (1979). The only "intentional and improper" conduct charged by plaintiffs is in essence the antitrust conspiracy. Because I find that plaintiffs have not produced sufficient proof of such a conspiracy to avoid summary judgment on the antitrust claim, I conclude that they have also failed to demonstrate "intentional and improper" conduct on defendants' part to meet their burden on the contract claim. Therefore, I believe that the district court properly granted summary judgment on the tortious interference claim.

Similarly, the Potamkins other claims rise and fall along with their antitrust claim. For this reason I would affirm the district court's decision to dismiss the claims for common-law conspiracy, violation of New York's Donnelly Act, and "unfair competition" under state law.

In sum, I join with the majority to affirm the district court's decision denying summary judgment on the Potamkins' claim under the Pennsylvania Board of Vehicles Act. However, as I would affirm the grant of summary judgment to BMW NA on the Potamkins' Sherman Act § 1 claim and the closely related tortious interference claim as well as the dismissal of the interwoven pendant state law antitrust and unfair competition claims, I respectfully dissent from the balance of the majority's opinion and judgment.